## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| AUTONAVIGARE LLC,<br><br>               Plaintiff,<br><br>v.<br><br>GENERAL MOTORS LLC,<br><br>               Defendant. | CIVIL ACTION NO. 2:25-cv-01205<br><br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFF'S COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff AutoNavigare LLC files this Complaint against Defendant General Motors LLC for infringement of U.S. Patent No. 7,584,049 ("the '049 Patent"), U.S. Patent No. 7,640,104 ("the '104 Patent), U.S. Patent No. 7,653,482 ("the '482 Patent"), U.S. Patent No. 7,725,254 ("the '254 Patent), U.S. Patent No. 8,694,232 ("the '232 Patent"), and U.S. Patent No. 9,766,801 ("the '801 Patent") (collectively, the "Asserted Patents").

## THE PARTIES

1.    Plaintiff AutoNavigare LLC ("AutoNavigare") is a Texas limited liability company located in Plano, Texas.

2.    Defendant General Motors LLC ("General Motors") is a Delaware corporation with a regular and established place of business located at 301 Freedom Drive, Roanoke, Texas 76262. On information and belief, General Motors is responsible for research and development, design, manufacturing, offers for sale, sales, marketing, importation, and distribution of automotive vehicles from General Motors-managed brands (e.g., Chevrolet, Buick, GMC, and Cadillac) in the United States, including this District. General Motors may be served with process through its

registered agent, Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

3.    General Motors has deep ties to Texas. General Motors employs more than 9,000 workers here and boasts that it has paid $1.2 billion in taxable wages to GM employees in the State. General Motors further admits that it has eighteen Texas facilities.



*See* https://web.archive.org/web/20250317211138/https://www.gm.com/company/usa-operations/texas (March 17, 2025).

4.    General Motors owns a facility located in this District that it calls its Fort Worth Parts Distribution Center.



*See* https://www.gm.com/company/us-operations.

5.     General Motors is engaged in making, using, offering for sale, selling and/or importing vehicles to and throughout the United States, including this District, having infotainment systems with navigation, driver assist, and/or multimedia device integration capabilities (the "Accused Products")[1].

## JURISDICTION AND VENUE

6.     This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 1, *et seq*., including, without limitation, 35 U.S.C. §§ 271, 281, 284, and 285. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

7.     This Court has specific and general personal jurisdiction over General Motors consistent with the requirements of the Due Process Clause of the United States Constitution and the Texas Long Arm Statute because, among other things, it (i) has engaged in continuous, systematic, and substantial business in Texas, (ii) maintains a principal place of business in Texas and in this District, (iii) is registered to do business in Texas, and (iv) has committed, and continues to commit, directly or through intermediaries (including subsidiaries, agents, distributors, affiliates, retailers, suppliers, integrators, customers, and others), acts of patent infringement in this State and this District. Such acts of infringement include making, using, testing, offering for sale, selling, and/or importing Accused Products (as more particularly identified and described throughout this Complaint) in this State and this District and/or inducing others to commit acts of patent infringement in this State and District. Indeed, General Motors has purposefully and voluntarily placed, and continues to place, one or more Accused Products into the stream of commerce through established distribution channels (including the Internet) with the expectation and intent that such products will be sold to, and purchased by, consumers in the United States,

---

[1] *See, e.g.*, Exhibits L-Q.

this State, and this District; and with the knowledge and expectation that such products (whether in standalone form or as integrated in downstream products) will be imported into and/or sold within the United States, this State, and this District.

8.      In addition, General Motors has derived substantial revenues from its infringing acts occurring within this State and this District, which includes at least part of the whole of its infringing activities alleged herein. General Motors also derives substantial revenues from regularly and persistently doing or soliciting business in this State and this District, which includes substantial revenue from infringing goods offered for sale and sold in this State and this District and services provided to Texas residents directly and/or vicariously through and/or in concert with its agents, intermediaries, distributors, importers, and subsidiaries.

9.      Further, General Motors has knowingly induced, and continues to knowingly induce, infringement within this State and this District by advertising, marketing, offering for sale and/or selling Accused Products (as more particularly identified and described throughout this Complaint) that incorporate the fundamental technologies covered by the Asserted Patents. Such advertising, marketing, offering for sale and/or selling of Accused Products is directed to consumers, customers, manufacturers, integrators, suppliers, distributors, resellers, partners, and/or end users, and this includes the provision of instructions, user manuals, advertising, and/or marketing materials that facilitate, direct and encourage the use of infringing products and related functionality with General Motors' knowledge thereof.

10.      General Motors has, in the multitude of ways described above, availed itself of the benefits and privileges of conducting business in this State and willingly subjected itself to this Court's exercise of personal jurisdiction over it. General Motors also has sufficient minimum contacts with this forum through its transaction of substantial business in this State and this District

and its acts of patent infringement as alleged herein that are purposefully directed towards this State and District.

11.     Venue is proper in this District under 28 U.S.C. §§ 1391 and 1400(b) because, among other things, (i) General Motors is subject to personal jurisdiction in this District, (ii) General Motors has committed acts of patent infringement in this District, and (iii) General Motors has at least one regular and established place of business in this District, including the facility at 301 Freedom Drive, Roanoke, Texas 76262.

## DEFENDANT'S PRE-SUIT KNOWLEDGE OF ITS INFRINGEMENTS

12.     Prior to filing this Complaint, AutoNavigare sent a letter to General Motors, addressed to Steven Roberts (IP and Complex Litigation Counsel), Grant Dixton (EVP and Chief Legal Officer), Mark Reuss (President), and Mary T. Barra (Chair and CEO), identifying the Asserted Patents as being infringed by General Motors products, and further including claim charts demonstrating those infringements.

13.     The Accused Products addressed in the Counts below include, but are not limited to, products identified in AutoNavigare's letter to General Motors. General Motors' past and continuing sales of the Accused Products: (i) willfully infringe the Asserted Patents; and (ii) impermissibly usurp the significant benefits of AutoNavigare's patented technologies without fair compensation.

## THE ASSERTED PATENTS AND TECHNOLOGY

14.     AutoNavigare is the sole and exclusive owner of all right, title, and interest in, and to, the Asserted Patents and holds the exclusive right to take all actions necessary to enforce them, including the filing of this lawsuit and the recovery of damages for all past, present, and future infringements.

**U.S. Patent 7,584,049**

15.    The '049 Patent is entitled, "Navigation Method, Processing Method for Navigation System, Map Data Management Device, Map Data Management Program, and Computer Program." The '049 Patent lawfully issued on September 1, 2009 and stems from U.S. Patent Application No. 10/521,327, which was filed on October 20, 2005 and claims priority to a Japanese Patent Application (JP2002-208763) filed on July 17, 2002. A copy of the '049 Patent is attached hereto as Exhibit A.

16.    The invention disclosed and claimed by the '049 Patent relates to navigation systems. At the time of the invention, navigation systems generally relied on map data stored in fixed media, such as a DVD, that could only be updated periodically and in its entirety (e.g., by replacing a DVD). *See* Ex. A, 9:39-49, 30:46-53.

17.    The inventor of the '049 Patent sought to improve upon prior art navigation devices through new techniques for updating the data used to provide mapping and navigation that did not require updating a map database in its entirety or replacing a storage medium (e.g., a DVD). To that end, the '049 Patent describes and claims specific technological improvements to navigation devices to improve how map-related data is organized, updated, and used by such devices through the use of, among other things, "meshes," that enable a navigation device to use both map data previously stored at the device and specific updated map data of interest to a user (e.g., map data in a particular area of interest, map data along a route) downloaded from a remote source. The claims of the patent are not directed to an abstract idea or other ineligible subject matter, but instead to technical improvements to navigation systems and devices.

18.    The specification and claims of the '049 Patent evidence the invention's technical improvement to navigation devices. The patent describes unique data structures that subdivide and

organize map-related data in units referred to as "meshes." Figures 4-6 of the '049 Patent (and related disclosure) describe the mesh-based data structures disclosed by the patent:



Ex. A, Fig. 4.



Ex. A, Fig. 5.



Ex. A, Fig. 7. The '049 Patent explains that the information represented by a mesh can be linked to geographic locations; thus, a mesh can be a geography-based division of data. *See, e.g., id.*, 7:32-33.

19.     The mesh-based data structures of the disclosed invention enable a flexible system in which a navigation device can rely on existing map data stored on the device in combination with updated map data for a particular "mesh" or "meshes" of interest (e.g., where updated map data is available for a particular area of interest or along a route). The mesh-based data structures used in the disclosed invention facilitate partial updates to map-related data that are less memory intensive and, thus, can be implemented more flexibly than prior art updates, including by update through remote means (e.g., wireless updates downloaded via the Internet). The patent identifies these and other benefits of the disclosed invention. *See* Ex. A, 30:46-33:10:

(1) Since map data can be updated in units of individual meshes, the entire recording medium, such as a DVD ROM, in which the map data are stored, does not need to be replaced with a new recording medium when the map data are partially updated. Since the minimum data update units are individual meshes, i.e., since data can be updated in units of individual sets of basic data and extension data, data that do not need to be updated are not updated and thus, the volume of data that need to be communicated (the communication cost) can be minimized. In

addition, individual sets of basic data and extension data can be updated over varying cycles.

(2) Since update data can also be provided through communication via the Internet, the latest version of the update data can be made available quickly at low cost.

20.     The '049 Patent also discloses novel processes and user interfaces for implementing a navigation system that uses meshes for updating map-related information. Examples of user interfaces are disclosed by Figures 18-24 of the '049 Patent (and related disclosure):



Ex. A, Fig. 22. Figure 22 illustrates a user interface for facilitating user selection of data categories and meshes for map updates along a route. In the embodiment of Figure 22, a navigation device

displays "data along the specified route available for [] update" (Figure 22(d)) and permits a user to select "a single category or a combination of categories of data to be updated." *Id.*, 28:42-56. After categories of updates are selected, the navigation device displays "the update target meshes related to the selected categories." *Id.*, 28:66-29:3. As illustrated by Figure 22 (for example), the disclosed user interfaces, in combination with the disclosed mesh-based organization and use of map-related data, allow a user to specify map updates of interest (e.g., particular categories of updated information along a route). As explained by the '049 Patent, this minimizes the amount of information for update (because only relevant data, not all data, can be updated), which in turn reduces the time and data needed for such updates. *See, e.g., id.*, 31:53-59, 32:9-15, 33:4-10. In other words, the disclosed user interfaces facilitate streamlined and reduced-cost data updates.

21.    The claims of the '049 Patent reflect the specific technical improvements disclosed by the '049 Patent. For example, independent claim 9 recites a "navigation device" that includes "a control unit that is configured to use map data stored in a fixed recording medium and update map data downloaded from a map data management apparatus ***in combination***." Ex. A, 36:8-12 (emphasis added). Similarly, independent claim 5 recites a method for use in a "navigation system that uses map data stored in a fixed recording medium and update map data downloaded from a map data management apparatus ***in combination***." *Id.*, 34:59-62 (emphasis added). These aspects of the invention were not well-understood, routine or conventional activity at the time of the invention.

22.    The specification explains that prior art navigation systems did not use updated map data downloaded from a remote source.

A navigation system in the related art reads data from a recording medium such as a CD ROM or a DVD-ROM alone. The navigation system achieved in the

> embodiment, on the other hand, uses the map data in the recording medium 2 and
>
> updated map data in combination.

Ex. A, 9:39-49; *see also id.*, 30:46-59. In other words, a "navigation device" with "a control unit that is configured to use map data stored in a fixed recording medium and update map data downloaded from a map data management apparatus in combination" (claim 9) and a "navigation system that uses map data stored in a fixed recording medium and update map data downloaded from a map data management apparatus in combination" (claim 5) were not well-understood, routine, or conventional activity at the time of the invention.

23.     Claims of the '049 Patent also incorporate the use of a "mesh" to manage map data and updates thereto. Claim 7, for example, recites a "navigation device" comprising "a control unit … wherein the control unit is configured to display a menu with which a user specifies an area of a map over which map data are to be updated … ***the map data being managed in units of a mesh***." Ex. A, 35:13-22 (emphasis added). Similarly, claim 1 recites "displaying a menu with which a user specifies an area of a map over which map data are to be updated … ***the map data being managed in units of a mesh***." *Id.*, 34:31-38 (emphasis added). These aspects of the claimed invention were not well-understood, routine, or conventional activity at the time of the invention.

24.     The prosecution history for the application that issued as the '049 Patent teaches that navigation devices and systems that managed map data in units of a mesh were not well-understood, routine, or conventional at the time of the invention. In response to a rejection over certain prior art, the applicant argued that the prior art did not teach or suggest "the map data being managed in units of a mesh." Ex. B, p. 14. Responsive to the reply, the USPTO allowed the claims, substantiating the fact that the elements of the issued claims were not well-understood, routine, or conventional activity at the time of the invention. *See* Ex. C.

25.    The claims of the '049 Patent also incorporate user interfaces for implementing the technological improvements to navigation devices disclosed by the patent. For instance, claim 1 recites "displaying a route and a map including the route, and displaying along the route one or more meshes including map data judged to be updated based upon the route, when the route-based option is selected from the options in the menu on display." Ex. A, 34:39-42. Similarly, claim 7 recites a control unit configured "to display a route and a map including the route, and displaying along the route one or more meshes including map data judged to be updated based upon the route, when the route-based option is selected from the options in the menu on display." *Id.*, 35:22-27. These limitations were not well-understood, routine, or conventional activity at the time of the invention.

26.    As discussed above, navigation devices using map data stored in a fixed recording medium in combination with updated map data downloaded from a map management apparatus were not well-understood, routine, or conventional at the time of the invention. Consequently, "displaying a route and a map including the route, and displaying along the route one or more meshes including map data judged to be updated based upon the route, when the route-based option is selected from the options in the menu on display" as claimed by claim 1 (and similar limitations in claim 7) would not have been well-understood, routine, or conventional at the time of the invention. Indeed, the specification explains that these aspects of the claimed invention are advantages of the invention. *See* Ex. A, 32:43-62. And, as discussed above and evidenced by the prosecution history for the '049 Patent, the use of meshes to manage and update map-related data was not well-understood, routine, or conventional activity at the time of the invention, much less the claimed user interfaces designed to implement the updating of maps using meshes. *See* Ex. B, pp. 14-15 (arguing in Reply that "displaying a route and a map including the route, and displaying

along the route one or more meshes including more data judged to be updated based upon the route, when the route-based option is selected from the options in the menu on display" as claimed in claim 1 was not disclosed in prior art); *see also* Ex. C (notice of allowance in response to Reply).

27. Claims 5 and 9 also incorporate novel user interfaces for implementing the technological improvements to navigation devices disclosed by the '049 Patent. For example, claim 5 recites "a step of prompting an input of at least one selected option in an update category menu prepared in advance and displaying the specific area distinguishable when the specific area is judged to have update map data based upon the input of the selected option." Ex. A, 34:66-35:3. Similarly, claim 9 recites a navigation device comprising a control unit configured "to prompt an input of at least one selected option in an update category menu prepared in advance and display the specific area distinguishably when the specific area is judged to have update map data based upon the input of the selected option." *Id.*, 36:18-22. These limitations were not well-understood, routine, or conventional activity at the time of the invention.

28. As discussed above, navigation devices that used map data stored in a fixed recording medium in combination with updated map data downloaded from a map management apparatus were not well-understood, routine, or conventional at the time of the invention. Consequently, "prompting an input of at least one selected option in an update category menu prepared in advance and displaying the specific area distinguishable when the specific area is judged to have update map data based upon the input of the selected option" as claimed by claim 9 (and similar limitations in claim 5) would not have been well-understood, routine, or conventional at the time of the invention. Indeed, the specification explains that these aspects of the claimed invention are advantages of the invention. *See* Ex. A, 33:4-10. The prosecution history for application that issued as the '049 Patent also evidences that the claimed user interface features

were not well-understood, routine, or conventional activities at the time of the invention. *See* Ex. B, p. 16 (arguing in Reply that "a step of prompting an input of at least one selected option in an update category menu prepared in advance and displaying the specific area distinguishably when the specific area is judged to have update map data based upon the input of the selected option" was not disclosed in prior art); *see also* Ex. C (notice of allowance in response to Reply).

29.    As discussed above, the '049 Patent describes and claims specific technological improvements to navigation devices to improve how such devices obtain and use updated map data, including (for example) through the use of meshes and unique user interfaces to facilitate download of updated map data of interest to a user for use with existing map data stored at the device. As of the priority date of the '049 Patent, navigation devices and technology did not use meshes to manage map data or use a combination of map data stored in a fixed recording medium (e.g., a DVD) and updated map data downloaded from a remote location to provide mapping and navigation. The technology disclosed and claimed by the '049 Patent enabled navigation devices to access and use updated map data in a way that, at the time of the invention, was an unconventional use of navigation and other computer technology. In other words, the improvements to managing and using updated map data by navigation devices and systems, as set forth by the claims of the '049 Patent, were not well-understood, routine, or conventional activity at the time of the invention.

30.    The '049 Patent describes and claims, among other things, specific technological improvements to navigation devices to improve how such devices obtain and use updated map-related data. The claims are not directed to an abstract idea. Rather, as discussed above and evidenced by the patent's specification, claims, and file history, the claims are drawn to specific navigation devices and systems that improve upon prior art navigation devices and systems

through the use of, among other things, updated map-related data provided in a way that it can be obtained from a remote source and used in combination with existing map data and unique user interfaces to facilitate obtaining such updated map-related data, each of which, and together, were not well-understood, routine, or conventional at the time of the invention.

***U.S. Patent 7,640,104***

31.    The '104 Patent is entitled, "Vehicle Navigation System and Method for Displaying Waypoint Information." The '104 Patent lawfully issued on December 29, 2009 and stems from U.S. Patent Application No. 11/364,119, which was filed on February 27, 2006. A copy of the '104 Patent is attached hereto as Exhibit D.

32.    The invention disclosed and claimed by the '104 Patent relates to technological improvements in how vehicle navigation systems identify and display waypoint information such as restaurants, hotels, or other points of interest (POIs) along a route. *See* Ex. D, Abstract, 1:8-11. At the time of the invention, navigation systems could show POIs but were fundamentally limited: they were "unable to correlate the desired waypoint along the route with the time to reach that waypoint," nor could they dynamically update waypoint selection based on traffic flow conditions. *See id.*, 1:37-43, 2:18-27. These prior systems likewise did not permit a user to specify meaningful constraints such as a desired time span (e.g., within 5 minutes of noon) or route deviation criteria (e.g., within two miles of the route). *See id.*, 2:18-27, 3:43-50. Because they lacked mechanisms to evaluate waypoints in view of such constraints, earlier navigation systems frequently cluttered map displays with irrelevant POIs. *See id.*, 2:18-27, 6:31-34. Prior systems further did not support two-way communication with waypoint content providers, which prevented the delivery of real-time information such as restaurant availability, promotions, or temporary closures from businesses along a route. *See id.*, 1:44-48, 3:67-4:3, 6:21-34.

33.     The '104 Patent introduces a series of concrete technological improvements to remedy these deficiencies. As described in the specification and flow diagrams, the navigation system allows users to input not only the type of desired waypoint but also the desired time of arrival and the permissible timing or distance deviation. *See id.*, 2:6-27, 3:30-50, 4:56-59, Fig. 3 step 50. For example, Fig. 2 is an exemplary screen display when the user inputs a pizza restaurant waypoint within 5 minutes of noon and no more than 2 miles from the route:



*Id.*, Fig. 2. Using this information, the navigation system's route calculation engine determines the predicted arrival time at candidate waypoints along the route based on real-time traffic information, stochastic traffic modeling, weather data, and other external conditions. *See id.*, 3:51-55; Fig. 3 step 52. The system continuously updates these calculations during travel, refining its waypoint recommendations in response to current vehicle position and evolving traffic conditions. *See id.*, 4:4-23. This iterative and dynamic processing was not performed by prior navigation systems and provides materially more accurate and relevant waypoint guidance. *See id.*

34.     A further improvement disclosed by the '104 Patent is its ability to avoid display clutter by selectively presenting only those waypoints that satisfy the user's timing and deviation

constraints. *See id.*, 2:18–27, 6:31-34. When no waypoint satisfies those constraints, the system warns the user and may propose an alternate route or recommend substitute waypoints that closely match the desired criteria. *See id.*, 4:24-55. The invention also supports two-way communication with external waypoint content providers, enabling the navigation system to receive timely waypoint-related information and targeted advertising from restaurants, hotels, and other businesses. *See id.*, 1:44-48, 3:67-4:3, 6:21-34. This communication architecture—absent in earlier navigation devices—allows POI information to be dynamic, current, and contextually relevant.

35.     The specification further discloses advanced processor logic for filtering and prioritizing waypoint information based on multiple inputs. For example, the system can extract keywords from speech detected inside the vehicle, RFID data identifying possessions carried by occupants, information from mobile devices such as cell phones, sensor data, and even visual information from a cabin-facing camera. *See id.*, 5:5-61; Fig. 4-5. This information is analyzed by dedicated algorithms to infer occupant preferences and conditions, enabling the system to filter and display waypoint information or advertisements tailored to the occupants' interests. *See id.*, 5:62-6:20. Prior navigation systems did not include such multi-modal data extraction or any framework capable of leveraging these inputs for waypoint selection.

36.     The claims of the '104 Patent reflect these technological advances. For example, "displaying information on a vehicle navigation system" of claims 1-16 includes "receiving criteria which identifies desired waypoint(s) along said route" and "selectively displaying received waypoint(s) on the screen which correspond to the desired waypoint(s)." *Id.*, Claims 1, 10. These claim limitations tie directly to the novel system architecture and processing logic disclosed in the specification, which together improve the functioning of vehicle navigation systems.

37.     The '104 Patent describes and claims specific, concrete technological

improvements to navigation systems—improvements that enable the system to intelligently determine waypoints based on desired arrival times, adapt dynamically to real-time conditions, reduce display clutter, integrate multi-modal user and environmental data, and communicate with external content providers. These innovations were not well-understood, routine, or conventional at the time of the invention and represent meaningful advancements in the field of automotive navigation technology.

### U.S. Patent 7,653,482

38.    The '482 Patent is entitled, "On-Vehicle Navigation Apparatus and Subject Vehicle Position Correction Method." The '482 Patent lawfully issued on January 26, 2010 and stems from U.S. Patent Application No. 11/597,937, which was filed on March 24, 2005 and claims priority to a Japanese Patent Application (JP2004-164744) filed on June 2, 2004. A copy of the '482 Patent is attached hereto as Exhibit E.

39.    The invention disclosed and claimed by the '482 Patent relates to technological improvements to "an on-vehicle navigation apparatus that indicates the subject vehicle position." Ex. E, 1:8-9. At the time of the invention, navigation systems primarily relied on GPS and gyro sensors to estimate the vehicle's position. *See id.*, 1:14-21. However, these systems routinely suffered from a phenomenon known as "position jump," whereby the system abruptly switched the vehicle position from one road to another, especially near branching points or closely spaced parallel roads. *See id.*, 1:21–32. These abrupt and erroneous position shifts caused user confusion, unreliable guidance, and repeated auto-rerouting events. *See id.*, 1:32-50.

40.    The inventor of the '482 Patent identified these shortcomings and sought to improve upon prior art techniques by incorporating image-based roadway analysis into the navigation system. *See id.*, 2:7-29. To that end, the '482 Patent describes and claims specific

technological improvements to vehicle-position correction, including the use of camera-captured images to detect road marker lines and determine the lane in which the vehicle is traveling. *See id.*, 2:7-3:7, 8:1-40, 10:52-11:9. These improvements allow the navigation system to determine vehicle position between multiple candidate roads and prevent position jump in environments where GPS-only systems were inadequate. *See id.*, 3:11-29.

41.     The specification and claims of the '482 Patent evidence the invention's technical improvements. The patent describes a novel combination of: (i) a map matching candidate identifying unit that selects roads based on vehicle position; (ii) a road marker line detection unit that analyzes camera imagery to detect lane boundaries; and (iii) a decision-making unit that determines, based on the detected lane geometry, whether the vehicle is actually traveling on a particular candidate road. *See, e.g., id.*, Abstract. Using these components, the navigation apparatus adjusts the vehicle position only when the system concludes, based on camera-derived lane information, that the vehicle is traveling on the candidate road. *See id.*, 7:8-65; FIG. 4. These aspects of the invention were not well-understood, routine, or conventional at the time of the invention.

42.     The specification further discloses a second embodiment that prevents erroneous position correction when the vehicle enters roadside facilities such as parking areas. *See id.*, 9:14-20. In prior systems, if a vehicle turned off the roadway into a nearby lot but remained geographically close to an adjacent road, the map matching algorithm would often have the vehicle's position on the road, creating significant inaccuracies. *See id.*, 9:34-37. The '482 Patent discloses detecting when the vehicle has moved over a road marker line and then stopping map matching corrections until the system determines the vehicle has returned to the roadway. *See id.*, 10:1-51; FIG. 7. This capability, which requires image-based detection of lane-edge transitions,

was not performed by prior navigation systems and provides a significant technical improvement in how map matching is executed. *See id.*, 10:52-11:9.

43.     The claims of the '482 Patent reflect these technological advances. For example, claim 1 recites an "on-vehicle navigation apparatus" comprising "a subject vehicle position detection unit," "a road marker line detection unit," "a map matching candidate identifying unit," "a decision making unit" configured to determine, based on camera-detected road marker lines, whether the vehicle is traveling on the identified road, and "a map matching unit" configured to correct the detected position only when the decision making unit determines that the vehicle is traveling on the identified road. *Id.*, Claim 1. Likewise, claim 3 recites a "subject vehicle position correction method" that includes "identifying a road to be designated as a map matching candidate," "making a decision based upon an image captured via a camera as to whether or not the subject vehicle is traveling on the identified road by making a decision as to whether or not the subject vehicle has moved over a road marker line," "correcting the subject vehicle position" when that determination is affirmative, and "stopping correcting the subject vehicle position" when that determination is negative. *Id.*, Claim 3. These limitations tie directly to the technical architecture disclosed in the specification and were not well-understood, routine, or conventional activities at the time of the invention.

44.     As described above, the '482 Patent provides a specific technical solution to the problem of unreliable GPS-only vehicle positioning by integrating real-time camera-based detection of lane boundaries and road marker geometry into the vehicle position correction process. As of the priority date of the '482 Patent, navigation devices and technology did not use camera-detected marker line information to determine whether the vehicle was traveling on a specific road, nor did they condition map matching on such determinations. *See, e.g., id.*, 1:14-60

The improvements disclosed and claimed by the '482 Patent enabled navigation devices to achieve more stable, accurate, and reliable map-matching in environments where prior systems routinely failed. *See, e.g., id.*, 2:7-3:7, 8:1-40, 10:52-11:9. In other words, the improvements to vehicle position correction using image-derived roadway information, as set forth by the claims of the '482 Patent, were not well-understood, routine, or conventional activity at the time of the invention.

45.    The '482 Patent describes and claims, among other things, specific technological improvements to navigation systems that improve how such systems detect, verify, and correct vehicle position information through the use of camera-based lane detection and conditional map matching logic. The claims are not directed to an abstract idea. Rather, as evidenced by the patent's specification and claims, they are drawn to a specific navigation apparatus and method that improve upon prior art navigation systems through techniques that were not well-understood, routine, or conventional at the time of the invention.

***U.S. Patent 7,725,254***

46.    The '254 Patent is entitled, "Navigation Device Used for a Route Search." The '254 Patent lawfully issued on May 25, 2010 and stems from U.S. Patent Application No. 11/514,931, which was filed on September 5, 2006 and claims priority to a Japanese Patent Application (JP2005-256485) filed on September 5, 2005. A copy of the '254 Patent is attached hereto as Exhibit F.

47.    The invention disclosed and claimed by the '254 Patent "relates to a navigation device, and particularly to a route search technique for a car-mounted navigation device." Ex. F, 1:7-9. Route searching, as used in the '254 Patent, refers to the implementation of route searching by one or more computer processors using data representing links (segments of road) and

associated data that can be used to calculate a cost of traversing a particular link (e.g., distance, speed limit, traffic conditions) to identify one or more preferred routes. At the time of the invention, the data sets used in route searching for road navigation and guidance were complex and contained large quantities of information that could not be meaningfully organized and maintained by pencil and paper, much less a human brain. Likewise, at the time of the invention, the processing required to perform route searching for road navigation and guidance was complex and required substantial computing power, particularly given the size and complexity of real-world data sets. A human could not perform route searching as contemplated by the '254 Patent and its claims with pencil and paper in any useful way on any useful data set, much less mentally.

48.    The inventors of the '254 Patent discerned that prior art navigation devices and techniques could be improved by using lane-specific link costs. *See* Ex. F, 1:5-27. To that end, the '254 Patent describes and claims specific technological improvements to navigation devices to improve route searching by such devices through use of lane-specific costs. The claims of the patent are not directed to an abstract idea or other ineligible subject matter, but instead to technical improvements to navigation devices.

49.    The specification and claims of the '254 Patent evidence the invention's technical improvements to navigation devices and route searching. The '254 Patent describes a navigation device that includes a processor configured to provide, among other things, route searching. "[F]or example, Dijkstra's algorithm for searching for a route connecting the two designated points (i.e. the present location and the destination) so that the cost (such as travel time) of the route becomes smallest." Ex. F, 5:52-56; *see also id.,* 2:55-61, 6:42-8:60. Notably, the specification explains how lane-specific cost data is used to provide improved route searching and guidance. *See, e.g., id.*, 7:5-8:60.

50.    To implement the disclosed invention, the '254 Patent describes new structures for storing map-related data, including costs associated with lanes of a link (a representation of a road segment), in a memory of a navigation device. As illustrated by the Figures 2-6 (and related disclosure), for example, the patent describes a navigation device with a memory that stores map data organized by links, where each link is associated with respective data, including lane information, and also statistic and cost information for the link, including lane-specific cost information. *See, e.g., id.*, 3:1-4:31. Specifically, Figures 2, 4 and 5 appears as follows:

FIG. 2



Ex. F, Fig. 2.



Ex. F, Fig. 4

**FIG. 5**

Ex. F, Fig. 5. The disclosed data structures, which (among other things) associate lane-related data with a link as opposed to treating a lane as a separate link, make better use of memory and reduce the complexity of route searching.

51.    The claims of the '254 Patent reflect the novel data structures and route search technology of the disclosed invention. For example, the "navigation device" of claims 1-6 includes "a storage unit configured to store link data for links constituting routes on a map, where at least one link has plural lanes including ones of a left-turn lane, a straight-through lane and a right-turn lane, and where the link data: identifies each link using an identifier, associates each respective lane with the identifier of the at least one link to which it belongs, and stores respective costs of

the respective lanes." Ex. F, 9:64-10:4. These aspects of the claimed invention were not well-understood, routine or conventional at the time of the invention.

52.    The prosecution history for the application that issued as the '254 Patent evidences that a "navigation device" comprising "a storage unit configured to store link data for links constituting routes on a map, where at least one link has plural lanes including ones of a left-turn lane, a straight-through lane and a right-turn lane, and where the link data: identifies each link using an identifier, associates each respective lane with the identifier of the at least one link to which it belongs, and stores respective costs of the respective lanes" was beyond well-understood, routine, or conventional activity at the time of the invention. During prosecution of the application that issued as the '254 Patent (U.S. Patent Application No. 11/514,931), the USPTO rejected the claims as un-patentable in view of prior art. In response, in an Amendment dated October 6, 2009, the applicant amended claim 1 as shown below:

> 1. (Currently Amended)  A navigation device, comprising:
>
> a storage means for storing a storage unit configured to store link data for links constituting routes on a map, where at least one link has plural lanes including ones of a left-turn lane, a straight-through lane and a right-turn lane, and where the link data: identifies each link using an identifier, associates each respective lane with the identifier of the at least one link to which it belongs, and stores respective costs of the respective lanes; and including cost of respective lanes of links constituting a road on a map; and
>
> a route search means for searching a route search unit adapted to search for a route having a lowest total cost to a destination, using said link data, including using the respective costs of the respective lanes.

Ex. G, p. 3. The applicant argued that the prior art did not disclose or suggest "storing costs with

respect to lanes." *See id*, pp. 10, 12. Responsive to the October 6, 2009 Amendment, the USPTO allowed the amended claims, evidencing that the elements of the issued claims were not well-understood, routine, or conventional activity at the time of the invention. *See* Ex. H.

53.     The improved route searching technology implemented by the disclosed navigation device is also reflected in the claims of the '254 Patent. For example, claim 1 recites "a route search unit adapted to search for a route having a lowest total cost to a destination, using laid link data, ***including using the respective costs of the respective lanes***." Ex. F, 10:5-8 (emphasis added); *see also id.*, 10:9-12 ("said route search unit uses, as a cost of a link on a route, a cost of a lane on which a vehicle runs to move to a next link, such being the cost of one of lanes of the link in question"); *id.*, 10:28-32 ("the route search unit uses, the route search unit uses, as a cost of a link on a route, a cost of a lane on which a vehicle runs to move to a next link this cost having been classified according to a collection condition corresponding to the situation at the time of arrival at the link in question"). "Said link data" and "the respective costs of the respective lanes" refers to information stored according to the novel data structures disclosed by the '254 Patent and claimed in the "storage unit" limitations of claim 1; thus, the claim language ties how the claimed route search unit searches for a route using the unique data structure of the navigation device disclosed and claimed by the '254 Patent.

54.     As explained by the '254 Patent, prior art navigation devices did not account for differences between costs of traveling on different lanes of a link when performing route searching. *See* Ex. F, 1:6-34. In other words, using lane costs to implement route searching in a navigation device, as set forth by the claims of the '254 Patent, was not well-understood, routine, or conventional activity at the time of the invention.

55.     The prosecution history for the '254 Patent further evidences that using lane-

specific costs to perform route searching was not well-understood, routine, or conventional activity. As discussed above, the claims of the application that issued as the '254 Patent (U.S. Application No. 11/514,931) were amended to recite, in part, "a route search unit adapted to search for a route having a lowest total cost to a destination, using said link data, *including using the respective costs of the respective lanes*" to overcome prior art rejections. *See* Ex. G, p. 3 (emphasis added to amended language). The USPTO allowed the claims in response to the applicant's amendments, evidencing that the route searching technology claimed by the patent was not well-understood, routine, or conventional at the time of the invention. *See* Ex. H.

56.     The '254 Patent describes and claims specific technological improvements to navigation devices to improve route searching and guidance by such devices through use of, among other things, lane specific costs for route searching. As of the priority date of the '254 Patent, navigation devices and technology did not account for lane specific costs for lanes of a link when performing route searching. The technology disclosed and claimed by the '254 Patent enabled navigation devices to provide route searching and guidance in a way that, at the time of the invention, was an unconventional use of navigation and other computing technology. In other words, taking into account lane-specific costs to perform route searching in a navigation device, as set forth by the claims of the '254 Patent, was not well-understood, routine, or conventional activity at the time of the invention.

57.     The '254 Patent describes and claims, among other things, specific technological improvements to navigation devices to improve route searching by such devices through use of lane-specific costs. The claims are not directed to an abstract idea. Rather, as discussed above and evidenced by the patent's specification, claims, and file history, the claims are drawn to a specific navigation device that improves upon prior art navigation devices and route searching technology

through the use of, among other things, novel data structures and route searching technology, each of which and together, were not well-understood, routine, or conventional at the time of the invention.

**U.S. Patent 8,694,232**

58.    The '232 Patent is entitled, "Method of Predicting Energy Consumption, Apparatus for Predicting Energy Consumption, and Terminal Apparatus." The '232 Patent lawfully issued on April 8, 2014 and stems from U.S. Patent Application No. 12/805,846, which was filed on Aug. 20, 2010 and claims priority to a Japanese Patent Application (JP2009-208001) filed on September 9, 2009. A copy of the '232 Patent is attached hereto as Exhibit I.

59.    The invention disclosed and claimed in the '232 Patent relates to technological improvements in predicting and using vehicular energy consumption information for navigation systems. *See* Ex. I, Abstract, 1:16-20. As explained in the specification, conventional approaches relied either on (1) physical models requiring accurate three-dimensional road geometry and detailed vehicle type parameters, or (2) statistics based on historical probe vehicle data that required large sample sizes for each vehicle type and driving pattern. *See id.*, 1:22-2:2. Both approaches were limited, as they performed poorly when road shape data was inaccurate, when certain vehicle models lacked prior data, or when probe vehicle data was insufficient. *See id.*, 2:8-2:21.

60.    The '232 Patent identifies these shortcomings and discloses specific technical solutions that allow energy consumption predictions to be made reliably, even when probe vehicle samples are sparse or vehicle type diversity is high. *See id.*, 2:8-2:38. The '232 Patent introduces a navigation architecture in which probe vehicle data including link-level travel time, vehicle type, and measured energy consumption is collected. *See id.*, 3:36-52, 4:20-28, FIGS. 1-2. Using this

collected data, the system calculates geographic characteristic values for each road link, i.e., values that reflect the energy-related attributes of the roadway itself (e.g., slope, friction, undulation) that are independent of vehicle type and driving pattern. *See id.*, 4:47-53, 10:56-11:21, 19:25-36, FIG. 9.

61.     The specification teaches, in detail, how the system removes vehicle specific and driver specific effects from the probe data. *See id.*, 8:15-14:67, FIGS. 7-8. Using a combination of road map information, vehicle type parameters, and a mathematically defined driving pattern model, the system isolates the portion of energy consumption attributable solely to the geography of the link. *See id.*, 8:32-50. These link specific constants include components corresponding to acceleration/deceleration, velocity, congestion, and regenerative effects (for electric vehicles). *See id.*, 8:60-65, 11:48-55.

62.     These geographic characteristic values are then used by the system to compute predicted energy consumption for any vehicle type, even one for which no historical probe data exists. *See id.*, 15:1-16:42, FIG. 11. As the patent explains, once the geographic characteristic values are calculated for a link, the navigation server (or navigation terminal, in the second embodiment) combines them with predicted travel times and a vehicle's specific parameters to generate a per-link predicted energy cost. *See id.*, 15:1-16:42, 19:50-57, FIG. 11.

63.     The '232 Patent further discloses how navigation terminals use these predicted energy consumptions, including predicted travel times, to perform route searches that minimize energy usage. *See id.*, 16:55-18:40, FIG. 13. The system applies these predicted per-link costs in a standard minimum cost routing algorithm to provide drivers routes that minimize total energy expenditure. *See id.*, 17:18-29. The patent illustrates example map displays presenting users with comparisons, e.g., among the lowest energy route, the shortest time route, and the shortest distance

route. *See id.*, 17:38-58, 18:22-30, FIGS. 14-15.

64.     In a second embodiment, the patent describes a distributed architecture where geographic characteristic values are periodically delivered to navigation terminals, enabling terminals to perform energy-consumption prediction locally without needing continuous server communication. *See id.*, 19:48-24:62; FIGS. 16-20. This further demonstrates that the patent is directed to concrete technological improvements in navigation systems because the embodiments teach specific data structures, algorithms, and system-level designs for efficient and accurate energy-prediction computation.

65.     The claims of the '232 Patent reflect these technological advancements. For example, claim 1 recites specific components and steps performed in a "method of predicting energy consumption," including "calculating geographic characteristic values" from probe vehicle data, "receiving a prediction energy consumption request" including a vehicle type, "calculating a predicted energy consumption" for each link based on the geographic characteristic values, and "delivering each predicted energy consumption" to a terminal, which in turn "output[s] route guide information." *Id.*, Claim 1. These claim requirements were not well-understood, routine, or conventional. They embody a technological solution to an identified deficiency in prior navigation systems that lack an accurate, scalable mechanism for predicting energy consumption across diverse vehicle types in varying road conditions.

66.     In sum, the '232 Patent describes and claims specific, non-conventional technical improvements to navigation systems by isolating link-specific geographic energy consumption characteristics and using them to generate accurate, vehicle-specific energy consumption predictions for route planning. At the time of the invention, navigation systems did not extract geography-only energy-influence parameters from noisy probe vehicle data, nor did they use such

values to perform link-level energy optimized routing. The '232 Patent provides a technical solution to these problems and is directed to patent eligible technological improvements, not abstract ideas.

***U.S. Patent 9,766,801***

67.    The '801 Patent is entitled, "In-Car Information System, In-Car Device, and Information Terminal." The '801 Patent lawfully issued on September 19, 2017 and stems from U.S. Patent Application No. 15/018,060, which was filed on February 8, 2016, and is a continuation of U.S. Patent Application No. 14/508,420, which was filed on October 7, 2014, itself a continuation of U.S. Patent Application No. 13/824,150 filed on September 16, 2011. The '801 Patent claims priority to three Japanese Patent Applications: JP2010-20933 (filed September 17, 2010), JP2010-251664 (filed November 10, 2010), and JP2011-090411 (filed April 14, 2011). A copy of the '801 Patent is attached hereto as Exhibit J.

68.    The '801 Patent describes and claims a novel interface that allows an information terminal and in-car device to establish communications, exchange functionality and configuration parameters, and generate information used to produce a menu that is displayed by the in-car device and used to control the execution and use of applications on the information terminal. The claims of the patent are not directed to an abstract idea or other ineligible subject matter, but instead to specific systems and devices that incorporate a technical solution to problems arising in systems wherein an in-car device (e.g., infotainment system) is used to control the execution or use of applications on an information terminal (e.g., a smartphone).

69.    The claims of the '801 Patent reflect the novel technological improvements of the disclosed invention. Claim 1 recites a specific technological system – "An in-car information system comprising an in-car device and an information terminal" – not an abstract idea or any

other ineligible subject matter. The claim recites limitations that narrowly tailor the claimed "in-car device" and "information terminal" to specific hardware configured to operate together in a particular way. *See* Ex. J, 71:36-72:11. Notably, the claimed "information terminal" includes, among other things, "an application manager," which corresponds to the novel "SPMan" disclosed by the '801 Patents. Claim 1 recites "the information terminal starts the application manager to transmit, from the video signal output unit to the in-car device, the video signal for displaying a menu screen on the in-car device display monitor when the information terminal receives the start command from the in-car device" and "the in-car device receives the video signal by the video signal input unit to display the menu screen on the in-car device display monitor on the basis of the received video signal." *Id.*, 72:1-11. Thus, the claim recites an in-car system in which a specifically claimed information terminal (e.g., smartphone) executes an application manager to transmit a video signal for displaying a menu screen on a specifically claimed in-car device (e.g., infotainment system). This was not well-understood, routine, or conventional activity at the time of the invention, as evidenced (for example) by the prosecution history of the application that issued as the '801 Patent. *See* Ex. K, p. 2.

70.    Claims 2 through 5 also recite a specific technological device – "An in-car device that is capable to be connected to an information terminal" – not an abstract idea or other ineligible subject matter. Like the system of claim 1, the "in-car device" of claims 2-5 includes specific hardware and is configured to operate in ways that were not well-understood, routine, or conventional activity at the time of the invention. The claimed in-car device includes "a display monitor of a touch panel type," "an interface unit that transmits actuation information on the basis of actuation on the display monitor," and "a video signal input unit that receives a video signal transmitted from the information terminal." Ex. J, 72:12-32. As evidenced by the prosecution

history (for example), the "in-car device" of claims 2 through 5 is configured to operate in ways that were not well-understood, routine, or conventional at the time of the invention. For example, claim 2 recites that the in-car device is configured to "become ready to transmit a start command for an application stored in the information terminal to the information terminal when the interface unit and the video signal input unit are connected to the information terminal." *See, e.g.,* 72:19-23. Other claims require that the in-car device interacts with an "application manager" on an information terminal, activity that was not well-understood, routine, or conventional at the time of the invention. *See, e.g., id.*, 72:24-39.

71.    Claims 6 and 7 of the '801 Patent are directed to a method for use in a specific technological system – "an in-car information system comprising an information terminal and an in-car device" – that addresses technical shortcomings in the prior art. The claimed "in-car device" is limited to specific configurations (i.e., "the in-car device includes: a display monitor of a touch type; an interface unit that transmits actuation information on the basis of actuation on the display monitor; and a video signal input unit that receives a video signal transmitted from the information terminal"). Ex. J, 72:50-55. The claim also recites that the claimed "in-car information system" performs the steps of, among others, "receiving the video signal for displaying a menus screen by the video signal input unit from the information terminal" and "displaying the menu screen on the display monitor on the basis of the received video signal." *Id.*, 72:56-67. Thus, the claims recite an in-car system in which a specifically-claimed in-car device (e.g., infotainment system) receives a video signal for displaying a menu screen from an information terminal (e.g., smartphone). This was not well-understood, routine, or conventional activity at the time of the invention, as evidenced (for example) by the prosecution history of the application that issued as the '801 Patent. *See* Ex. K.

72.    The '801 Patent describes and claims specific technological improvements to systems in which an in-car device (e.g., infotainment system) is used to interface with and control the operation of an information terminal (e.g., smartphone), including through the use of, among other things, a novel interface that facilitates interoperability between the in-car device and information terminal and generates information that can be used to by the in-car device to produce and display a menu for controlling the execution of applications by an information terminal. The claims are not directed to an abstract idea, but instead to specific technical systems and devices configured to operate in ways that were not well-understood, routine, or conventional at the time of the invention to address shortcomings in the prior art.

***Summary***

73.    The claims of the Asserted Patents are directed to patent-eligible subject matter under 35 U.S.C. § 101. They are not directed to abstract ideas, and the technologies covered by the claims comprise systems and/or ordered combinations of features and functions that, at the time of invention, were not, alone or in combination, well-understood, routine, or conventional.

74.    AutoNavigare's claims do not have damages limited by 35 U.S.C. § 287. AutoNavigare seeks damages only for infringement of: (i) method claims of the '049 and '482 Patents; and (ii) claims of the '104, '254, '232, and '801 Patents accruing upon, and after, notice of infringement to General Motors.

## COUNT I

### (INFRINGEMENT OF U.S. PATENT NO. 7,584,049)

75.    AutoNavigare incorporates the preceding paragraphs herein by reference.

76.    This cause of action arises under the patent laws of the United States and, in particular, 35 U.S.C. §§ 271, *et seq*.

77.    AutoNavigare is the owner of all substantial rights, title, and interest in and to the

'049 Patent, including the right to exclude others and to enforce, sue, and recover damages for past infringements.

78.    The '049 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on September 1, 2009, after full and fair examination.

79.    Attached hereto as Exhibit L, and incorporated herein by reference, is an exemplary claim mapping that details how General Motors infringes claim 5 of the '049 Patent.[2]

***Direct Infringement (35 U.S.C. § 271(a))***

80.    General Motors has directly infringed and continues to directly infringe one or more claims of the '049 Patent in this District and elsewhere in Texas and the United States.

81.    To this end, General Motors directly infringes, either by itself or via its agent(s), at least claim 5 of the '049 Patent as set forth under 35 U.S.C. § 271(a) by, among other things, using (including through testing or demonstration) Chevrolet, Buick, GMC, and Cadillac branded vehicles equipped with built-in navigation systems that incorporate the fundamental technologies covered by the '049 Patent, including, but not limited to, Chevrolet, Buick, GMC, and Cadillac branded vehicles equipped with General Motors' Chevrolet/GMC/Buick/Cadillac Google Built-In Infotainment System (including EV versions) with built-in navigation capabilities (collectively, the "'049 Accused Products"), as illustrated, e.g., in Exhibit L. In addition, on information and belief, General Motors retains title to, and ownership and control over, '049 Accused Products in vehicles that it leases to customers and other end users and is, thus, liable for infringements performed by the vehicles.

82.    Additionally and/or in the alternative, General Motors directly infringes, either by

---

[2] The claim chart attached hereto as Exhibit L is exemplary and should not be interpreted as limiting AutoNavigare's infringement theories or be considered an admission that any claim is representative, whether for purposes of determining subject matter eligibility or any other issue.

itself or via its agent(s), at least claim 5 of the '049 Patent by directing, controlling, and setting into operation the performance of the claimed methods of the '049 Patent (as illustrated, e.g., in Exhibit L). General Motors directs and controls the '049 Accused Products' performance of the steps of the claimed method(s), as General Motors provides software that is not accessible to end users and automatically performs the steps of the claimed methods through normal operation of the infotainment system without user action. Further, General Motors conditions receipt of various benefits upon performance of the patented methods (e.g., by providing end users seamless integration of key infotainment system functionality consistent with their expectations, as well as by providing manufacturer warranties conditioned upon operation of the vehicle without alteration). In addition, General Motors conditions use of its infotainment services and software on acceptance of a General Motors Vehicle Software End User License Agreement that prohibits end users from modifying the services and software. Thus, General Motors conditions use of its infotainment system on allowing General Motors to implement functionality that performs methods claimed by the '049 Patent. As discussed above, General Motors does more than merely sell a product with software that performs the claimed methods; rather, General Motors exercises control over the equipment and software that performs the method set forth in at least claim 5 of the '049 Patent.

***Indirect Infringement (Inducement – 35 U.S.C. § 271(b))***

83.    In addition and/or in the alternative to its direct infringements, General Motors has indirectly infringed and continues to indirectly infringe one or more claims of the '049 Patent by knowingly and intentionally inducing others, including its customers and/or other end users, to directly infringe the '049 Patent.

84.    At a minimum, General Motors has knowledge of the '049 Patent since at least

service of the original Complaint in this action. General Motors also has knowledge of the '049 Patent since receiving detailed correspondence from AutoNavigare prior to the filing of the original Complaint, alerting General Motors to its infringements. Since receiving notice of its infringements, General Motors has actively induced, and continues to actively induce, the direct infringements of its customers and/or other end users (e.g., as illustrated by Exhibit L) as set forth under U.S.C. § 271(b). Such inducements have been committed with knowledge, or with willful blindness to the fact, that the acts induced constitute infringement of the '049 Patent. Indeed, General Motors has intended to cause, continues to intend to cause, and has taken, and continues to take, affirmative steps to induce infringements by, among other things, creating and disseminating advertisements and instructive materials that promote the infringing use of the '049 Accused Products, including marketing materials, user manuals (e.g., those available via https://experience.gm.com/support/vehicle/manuals-guides), and online instructional materials (e.g., those available via https://www.youtube.com/@GeneralMotors) that specifically teach and encourage customers and other end users to use the '049 Accused Products in an infringing manner. By providing such instructions and support, General Motors knows (and has known), or should know (and should have known), that its actions have actively induced, and continue to actively induce, infringement of the '049 Patent.

***Damages***

85.    AutoNavigare has been damaged by General Motors' infringing conduct described in this Count. General Motors is, thus, liable to AutoNavigare in an amount that adequately compensates it for General Motors' infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

86.    On information and belief, despite having knowledge of the '049 Patent and

knowledge that it directly and/or indirectly infringes one or more claims of the '049 Patent, General Motors has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. General Motors' infringing activities relative to the '049 Patent have, thus, been, and continue to be, willful, wanton, and deliberate in disregard of AutoNavigare's rights with respect to the '049 Patent, justifying enhanced damages under 35 U.S.C. § 284.

## COUNT II

### (INFRINGEMENT OF U.S. PATENT NO. 7,640,104)

87.    AutoNavigare incorporates the preceding paragraphs herein by reference.

88.    This cause of action arises under the patent laws of the United States and, in particular, 35 U.S.C. §§ 271, *et seq.*

89.    AutoNavigare is the owner of all substantial rights, title, and interest in and to the '104 Patent, including the right to exclude others and to enforce, sue, and recover damages for past infringements.

90.    The '104 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on December 29, 2009, after full and fair examination.

91.    Attached hereto as Exhibit M, and incorporated herein by reference, is an exemplary claim mapping that details how General Motors infringes claim 1 of the '104 Patent.[3]

### Direct Infringement (35 U.S.C. § 271(a))

92.    General Motors has directly infringed and continues to directly infringe one or more claims of the '104 Patent in this District and elsewhere in Texas and the United States.

93.    To this end, General Motors directly infringes, either by itself or via its agent(s), at

---

[3] The claim chart attached hereto as Exhibit M is exemplary and should not be interpreted as limiting AutoNavigare's infringement theories or be considered an admission that any claim is representative, whether for purposes of determining subject matter eligibility or any other issue.

least claim 1 of the '104 Patent by making, using (including through testing or demonstration), offering to sell, selling, and/or importing Chevrolet, Buick, GMC, and Cadillac branded vehicles equipped with built-in navigation systems that incorporate the fundamental technologies covered by the '104 Patent, including, but not limited to, Chevrolet, Buick, GMC, and Cadillac branded vehicles equipped with General Motors' Chevrolet/GMC/Buick Infotainment 3 System, Chevrolet/GMC/Buick/Cadillac Google Built-In Infotainment System (including EV versions), Buick Ultrawide Infotainment System, Cadillac Next Gen Infotainment System, and Cadillac OLED Infotainment System with built-in navigation capabilities (collectively, the "'104 Accused Products"), as illustrated, e.g., in Exhibit M.

***Indirect Infringement (Inducement – 35 U.S.C. § 271(b))***

94.    In addition and/or in the alternative to its direct infringements, General Motors has indirectly infringed and continues to indirectly infringe one or more claims of the '104 Patent by knowingly and intentionally inducing others, including its customers and/or other end users, to directly infringe the '104 Patent.

95.    At a minimum, General Motors has knowledge of the '104 Patent since at least service of the original Complaint in this action. General Motors also has knowledge of the '104 Patent since receiving detailed correspondence from AutoNavigare prior to the filing of the original Complaint, alerting General Motors to its infringements. Since receiving notice of its infringements, General Motors has actively induced, and continues to actively induce, the direct infringements of its customers and/or other end users (e.g., as illustrated by Exhibit M) as set forth under U.S.C. § 271(b). Such inducements have been committed with knowledge, or with willful blindness to the fact, that the acts induced constitute infringement of the '104 Patent. Indeed, General Motors has intended to cause, continues to intend to cause, and has taken, and continues

to take, affirmative steps to induce infringement by, among other things, creating and disseminating advertisements and instructive materials that promote the infringing use of the '104 Accused Products, including marketing materials, user manuals (e.g., those available via https://experience.gm.com/support/vehicle/manuals-guides), and online instructional materials (e.g., those available via https://www.youtube.com/@GeneralMotors) that specifically teach and encourage customers and other end users to use the '104 Accused Products in an infringing manner. By providing such instructions and support, General Motors knows (and has known), or should know (and should have known), that its actions have actively induced, and continue to actively induce, infringement of the '104 Patent.

***Damages***

96.    AutoNavigare has been damaged by General Motors' infringing conduct described in this Count. General Motors is, thus, liable to AutoNavigare in an amount that adequately compensates it for General Motors' infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

97.    On information and belief, despite having knowledge of the '104 Patent and knowledge that it directly and/or indirectly infringes one or more claims of the '104 Patent, General Motors has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. General Motors' infringing activities relative to the '104 Patent have, thus, been, and continue to be, willful, wanton, and deliberate in disregard of AutoNavigare's rights with respect to the '104 Patent, justifying enhanced damages under 35 U.S.C. § 284.

## <u>COUNT III</u>
### (INFRINGEMENT OF U.S. PATENT NO. 7,653,482)

98.    AutoNavigare incorporates the preceding paragraphs herein by reference.

99.    This cause of action arises under the patent laws of the United States and, in

particular, 35 U.S.C. §§ 271, *et seq.*

100.    AutoNavigare is the owner of all substantial rights, title, and interest in and to the '482 Patent, including the right to exclude others and to enforce, sue, and recover damages for past infringements.

101.    The '482 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on January 26, 2010, after full and fair examination.

102.    Attached hereto as Exhibit N, and incorporated herein by reference, is an exemplary claim mapping that details how General Motors infringes claim 3 of the '482 Patent.[4]

### Direct Infringement (35 U.S.C. § 271(a))

103.    General Motors has directly infringed and continues to directly infringe one or more claims of the '482 Patent in this District and elsewhere in Texas and the United States.

104.    To this end, General Motors directly infringes, either by itself or via its agent(s), at least claim 3 of the '482 Patent by among other things, using (including through testing or demonstration) Chevrolet, Buick, GMC, and Cadillac branded vehicles equipped with built-in navigation systems that incorporate the fundamental technologies covered by the '482 Patent, including, but not limited to, Chevrolet, Buick, GMC, and Cadillac branded vehicles equipped with General Motors' Chevrolet/GMC Infotainment 3 System, Chevrolet/GMC/Buick/Cadillac Google Built-In Infotainment System (including EV versions), Cadillac Next Gen Infotainment System, and Cadillac OLED Infotainment System with Super Cruise functionality (collectively, the "'482 Accused Products"), as illustrated, e.g., by Exhibit N. In addition, on information and belief, General Motors retains title to, and ownership and control over, '482 Accused Products in

---

[4] The claim chart attached hereto as Exhibit N is exemplary and should not be interpreted as limiting AutoNavigare's infringement theories or be considered an admission that any claim is representative, whether for purposes of determining subject matter eligibility or any other issue.

vehicles that it leases to customers and other end users and is, thus, liable for infringements performed by the vehicles.

105.    Additionally and/or in the alternative, General Motors directly infringes, either by itself or via its agent(s), at least claim 3 of the '482 Patent by directing, controlling, and setting into operation the performance of the claimed methods of the '482 Patent (as illustrated, e.g., in Exhibit N). General Motors directs and controls the '482 Accused Products' performance of the steps of the claimed method(s), as General Motors provides software that is not accessible to end users and automatically performs the steps of the claimed methods through normal operation of the infotainment system without user action. Further, General Motors conditions receipt of various benefits upon performance of the patented methods (e.g., by providing end users seamless integration of key infotainment system functionality consistent with their expectations, as well as by providing manufacturer warranties conditioned upon operation of the vehicle without alteration). In addition, General Motors conditions use of its infotainment services and software on acceptance of a General Motors Vehicle Software End User License Agreement that prohibits end users from modifying the services and software. Thus, General Motors conditions use of its infotainment system on allowing General Motors to implement functionality that performs methods claimed by the '482 Patent. As discussed above, General Motors does more than merely sell a product with software that performs the claimed methods; rather, General Motors exercises control over the equipment and software that performs the method set forth in at least claim 3 of the '482 Patent.

***Indirect Infringement (Inducement – 35 U.S.C. § 271(b))***

106.    In addition and/or in the alternative to its direct infringements, General Motors has indirectly infringed and continues to indirectly infringe one or more claims of the '482 Patent by

knowingly and intentionally inducing others, including its customers and/or other end users, to directly infringe the '482 Patent.

107.    At a minimum, General Motors has knowledge of the '482 Patent since at least service of the original Complaint in this action. General Motors also has knowledge of the '482 Patent since receiving detailed correspondence from AutoNavigare prior to the filing of the original Complaint, alerting General Motors to its infringements. Since receiving notice of its infringements, General Motors has actively induced, and continues to actively induce, the direct infringements of its customers and/or other end users (e.g., as illustrated by Exhibit N) as set forth under U.S.C. § 271(b). Such inducements have been committed with knowledge, or with willful blindness to the fact, that the acts induced constitute infringement of the '482 Patent. Indeed, General Motors has intended to cause, continues to intend to cause, and has taken, and continues to take, affirmative steps to induce infringement by, among other things, creating and disseminating advertisements and instructive materials that promote the infringing use of the '482 Accused Products, including marketing materials, user manuals (e.g., those available via https://experience.gm.com/support/vehicle/manuals-guides), and online instructional materials (e.g., those available via https://www.youtube.com/@GeneralMotors) that specifically teach and encourage customers and other end users to use the '482 Accused Products in an infringing manner. By providing such instructions and support, General Motors knows (and has known), or should know (and should have known), that its actions have actively induced, and continue to actively induce, infringement of the '482 Patent.

***Damages***

108.    AutoNavigare has been damaged by General Motors' infringing conduct described in this Count. General Motors is, thus, liable to AutoNavigare in an amount that adequately

compensates it for General Motors' infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

109.     On information and belief, despite having knowledge of the '482 Patent and knowledge that it directly and/or indirectly infringes one or more claims of the '482 Patent, General Motors has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. General Motors' infringing activities relative to the '482 Patent have, thus, been, and continue to be, willful, wanton, and deliberate in disregard of AutoNavigare's rights with respect to the '482 Patent, justifying enhanced damages under 35 U.S.C. § 284.

## COUNT IV
### (INFRINGEMENT OF U.S. PATENT NO. 7,725,254)

110.     AutoNavigare incorporates the preceding paragraphs herein by reference.

111.     This cause of action arises under the patent laws of the United States and, in particular, 35 U.S.C. §§ 271, *et seq*.

112.     AutoNavigare is the owner of all substantial rights, title, and interest in and to the '254 Patent, including the right to exclude others and to enforce, sue, and recover damages for past infringements.

113.     The '254 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on May 25, 2010, after full and fair examination.

114.     Attached hereto as Exhibit O, and incorporated herein by reference, is an exemplary claim mapping that details how General Motors infringes claim 1 of the '254 Patent.[5]

---

[5] The claim chart attached hereto as Exhibit O is exemplary and should not be interpreted as limiting AutoNavigare's infringement theories or be considered an admission that any claim is representative, whether for purposes of determining subject matter eligibility or any other issue.

*Direct Infringement (35 U.S.C. § 271(a))*

115.    General Motors has directly infringed and continues to directly infringe one or more claims of the '254 Patent in this District and elsewhere in Texas and the United States.

116.    To this end, General Motors directly infringes, either by itself or via its agent(s), at least claim 1 of the '254 Patent as set forth under 35 U.S.C. § 271(a) by making, using (including through testing or demonstration), offering to sell, selling, and/or importing Chevrolet, Buick, GMC, and Cadillac branded vehicles equipped with built-in navigation systems that incorporate the fundamental technologies covered by the '254 Patent, including, but not limited to, Chevrolet, Buick, GMC, and Cadillac branded vehicles equipped with General Motors' Chevrolet/GMC/Buick/Cadillac Google Built-In Infotainment System (including EV versions) with built-in navigation capabilities (collectively, the "'254 Accused Products"), as illustrated, e.g., by Exhibit O.

117.    General Motors also directly infringes the '254 Patent by using (including through testing or demonstrating) route searching features of the '254 Accused Products, which puts the claimed system into service because it initiates at the '254 Accused Product a demand for searching routes and benefits from the back end providing that service.

*Indirect Infringement (Inducement – 35 U.S.C. § 271(b))*

118.    In addition and/or in the alternative to its direct infringements, General Motors has indirectly infringed and continues to indirectly infringe one or more claims of the '254 Patent by knowingly and intentionally inducing others, including its customers and/or other end users, to directly infringe the '254 Patent.

119.    At a minimum, General Motors has knowledge of the '254 Patent since at least service of the original Complaint in this action. General Motors also has knowledge of the '254

Patent since receiving detailed correspondence from AutoNavigare prior to the filing of the original Complaint, alerting General Motors to its infringements. Since receiving notice of its infringements, General Motors has actively induced, and continues to actively induce, the direct infringements of its customers and/or other end users (e.g., as illustrated by Exhibit O) as set forth under U.S.C. § 271(b). Such inducements have been committed with knowledge, or with willful blindness to the fact, that the acts induced constitute infringement of the '254 Patent. Indeed, General Motors has intended to cause, continues to intend to cause, and has taken, and continues to take, affirmative steps to induce infringement by, among other things, creating and disseminating advertisements and instructive materials that promote the infringing use of the '254 Accused Products, including marketing materials, user manuals (e.g., those available via https://experience.gm.com/support/vehicle/manuals-guides), and online instructional materials (e.g., those available via https://www.youtube.com/@GeneralMotors) that specifically teach and encourage customers and other end users to use the '254 Accused Products in an infringing manner. By providing such instructions and support, General Motors knows (and has known), or should know (and should have known), that its actions have actively induced, and continue to actively induce, infringement of the '254 Patent. Furthermore, the '254 Accused Products initiate a demand for searching routes and benefits from the back end providing that service.

### Damages

120.    AutoNavigare has been damaged by General Motors' infringing conduct described in this Count. General Motors is, thus, liable to AutoNavigare in an amount that adequately compensates it for General Motors' infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

121.    On information and belief, despite having knowledge of the '254 Patent and

knowledge that it directly and/or indirectly infringes one or more claims of the '254 Patent, General Motors has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. General Motors' infringing activities relative to the '254 Patent have, thus, been, and continue to be, willful, wanton, and deliberate in disregard of AutoNavigare's rights with respect to the '254 Patent, justifying enhanced damages under 35 U.S.C. § 284.

## COUNT V
### (INFRINGEMENT OF U.S. PATENT NO. 8,694,232)

122.    AutoNavigare incorporates the preceding paragraphs herein by reference.

123.    This cause of action arises under the patent laws of the United States and, in particular, 35 U.S.C. §§ 271, *et seq*.

124.    AutoNavigare is the owner of all substantial rights, title, and interest in and to the '232 Patent, including the right to exclude others and to enforce, sue, and recover damages for past infringements.

125.    The '232 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on April 8, 2014, after full and fair examination.

126.    Attached hereto as Exhibit P, and incorporated herein by reference, is an exemplary claim mapping that details how General Motors infringes claim 1 of the '232 Patent.[6]

***Direct Infringement (35 U.S.C. § 271(a))***

127.    General Motors has directly infringed and continues to directly infringe one or more claims of the '232 Patent in this District and elsewhere in Texas and the United States.

128.    To this end, General Motors directly infringes, either by itself or via its agent(s), at

---

[6] The claim chart attached hereto as Exhibit P is exemplary and should not be interpreted as limiting AutoNavigare's infringement theories or be considered an admission that any claim is representative, whether for purposes of determining subject matter eligibility or any other issue.

least claim 1 of the '232 Patent by making, using (including through testing or demonstration), offering to sell, selling, and/or importing Chevrolet, Buick, GMC, and Cadillac branded vehicles equipped with touchscreen infotainment systems that incorporate the technologies covered by the '232 Patent, including, but not limited to, Chevrolet, Buick, GMC, and Cadillac branded vehicles equipped with General Motors' Chevrolet/GMC/Buick/Cadillac Google Built-In Infotainment System (including EV versions) with built-in navigation capabilities that support predicting energy consumption (collectively, the "'232 Accused Products"), as illustrated, e.g., by Exhibit P.

129.    General Motors also directly infringes the '232 Patent by using (including through testing or demonstrating) energy consumption prediction features of the '232 Accused Products, which puts the claimed system into service because it initiates at the '232 Accused Product a demand for predicting energy consumption and benefits from the back end providing that service.

*Indirect Infringement (Inducement – 35 U.S.C. § 271(b))*

130.    In addition and/or in the alternative to its direct infringements, General Motors has indirectly infringed and continues to indirectly infringe one or more claims of the '232 Patent by knowingly and intentionally inducing others, including its customers and/or other end users, to directly infringe the '232 Patent.

131.    At a minimum, General Motors has knowledge of the '232 Patent since at least service of the original Complaint in this action. General Motors also has knowledge of the '232 Patent since receiving detailed correspondence from AutoNavigare prior to the filing of the original Complaint, alerting General Motors to its infringements. Since receiving notice of its infringements, General Motors has actively induced, and continues to actively induce, the direct infringements of its customers and/or other end users (e.g., as illustrated by Exhibit P) as set forth under U.S.C. § 271(b). Such inducements have been committed with the knowledge, or with

willful blindness to the fact, that the acts induced constitute infringement of the '232 Patent. Indeed, General Motors has intended to cause, continues to intend to cause, and has taken, and continues to take, affirmative steps to induce infringement by, among other things, creating and disseminating advertisements and instructive materials that promote the infringing use of the '232 Accused Products, including marketing materials, user manuals (e.g., those available via https://experience.gm.com/support/vehicle/manuals-guides), and online instructional materials (e.g., those available via https://www.youtube.com/@GeneralMotors) that specifically teach and encourage customers and other end users to use the '232 Accused Products in an infringing manner. By providing such instructions and support, General Motors knows (and has known), or should know (and should have known), that its actions have actively induced, and continue to actively induce, infringement of the '232 Patent. Furthermore, the '254 Accused Products initiate a demand for predicting energy consumption and benefits from the back end providing that service.

***Damages***

132.    AutoNavigare has been damaged by General Motors' infringing conduct described in this Count. General Motors is, thus, liable to AutoNavigare in an amount that adequately compensates it for General Motors' infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

133.    On information and belief, despite having knowledge of the '232 Patent and knowledge that it directly and/or indirectly infringes one or more claims of the '232 Patent, General Motors has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. General Motors' infringing activities relative to the '232 Patent have, thus, been, and continue to be, willful, wanton, and deliberate in disregard of AutoNavigare's rights with respect to the '232 Patent, justifying enhanced damages under 35 U.S.C. § 284.

## COUNT VI

### (INFRINGEMENT OF U.S. PATENT NO. 9,766,801)

134.    AutoNavigare incorporates the preceding paragraphs herein by reference.

135.    This cause of action arises under the patent laws of the United States and, in particular, 35 U.S.C. §§ 271, *et seq*.

136.    AutoNavigare is the owner of all substantial rights, title, and interest in and to the '801 Patent, including the right to exclude others and to enforce, sue, and recover damages for past infringements.

137.    The '801 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on September 19, 2017, after full and fair examination.

138.    Attached hereto as Exhibit Q, and incorporated herein by reference, is an exemplary claim mapping that details how General Motors infringes claim 2 of the '801 Patent.[7]

***Direct Infringement (35 U.S.C. § 271(a))***

139.    General Motors has directly infringed and continues to directly infringe one or more claims of the '801 Patent in this District and elsewhere in Texas and the United States.

140.    To this end, General Motors directly infringes, either by itself or via its agent(s), at least claim 2 of the '801 Patent as set forth under 35 U.S.C. § 271(a) by making, using (including through testing or demonstration), offering to sell, selling, and/or importing Chevrolet, Buick, GMC, and Cadillac branded vehicles equipped with infotainment systems that incorporate the fundamental technologies covered by the '801 Patent, including, but not limited to, Chevrolet, Buick, GMC, and Cadillac branded vehicles equipped with touchscreen infotainment systems that

---

[7] The claim chart attached hereto as Exhibit Q is exemplary and should not be interpreted as limiting AutoNavigare's infringement theories or be considered an admission that any claim is representative, whether for purposes of determining subject matter eligibility or any other issue.

support the integration of multimedia devices (e.g., smartphones) with the infotainment systems through a wired connection (e.g., via a USB data interface) and/or wirelessly (e.g., via Bluetooth) such as General Motors' Chevrolet/GMC/Buick Infotainment 3 System, Chevrolet/GMC/Buick/Cadillac Google Built-In Infotainment System, Buick Ultrawide Infotainment System, Cadillac Next Gen Infotainment System, and Cadillac OLED Infotainment System (collectively, the "'801 Accused Products"), as illustrated, e.g., by Exhibit Q.

***Indirect Infringement (Inducement – 35 U.S.C. § 271(b))***

141.    In addition and/or in the alternative to its direct infringements, General Motors has indirectly infringed and continues to indirectly infringe one or more claims of the '801 Patent by knowingly and intentionally inducing others, including its customers and/or other end users, to directly infringe the '801 Patent.

142.    At a minimum, General Motors has knowledge of the '801 Patent since at least being served with the original Complaint in this action. General Motors also has knowledge of the '801 Patent since receiving detailed correspondence from AutoNavigare prior to the filing of the original Complaint, alerting General Motors to its infringements. Since receiving notice of its infringements, General Motors has actively induced, and continues to actively induce, the direct infringements of its customers and/or other end users (e.g., as illustrated by Exhibit Q) as set forth under U.S.C. § 271(b). Such inducements have been committed with the knowledge, or with willful blindness to the fact, that the acts induced constitute infringement of the '801 Patent. Indeed, General Motors has intended to cause, continues to intend to cause, and has taken, and continues to take, affirmative steps to induce infringement by, among other things, creating and disseminating advertisements and instructive materials that promote the infringing use of the '801 Accused Products, including marketing materials, user manuals (e.g., those available via

https://experience.gm.com/support/vehicle/manuals-guides), and online instructional materials (e.g., those available via https://www.youtube.com/@GeneralMotors) that specifically teach and encourage customers and other end users to use the '801 Accused Products in an infringing manner. By providing such instructions and support, General Motors knows (and has known), or should know (and should have known), that its actions have actively induced, and continue to actively induce, infringement of the '801 Patent.

***Damages***

143.    AutoNavigare has been damaged by General Motors' infringing conduct described in this Count. General Motors is, thus, liable to AutoNavigare in an amount that adequately compensates it for General Motors' infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

144.    On information and belief, despite having knowledge of the '801 Patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '801 Patent, General Motors has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. General Motors' infringing activities relative to the '801 Patent have, thus, been, and continue to be, willful, wanton, and deliberate in disregard of AutoNavigare's rights with respect to the '801 Patent, justifying enhanced damages under 35 U.S.C. § 284.

## CONCLUSION

145.    AutoNavigare is entitled to recover from General Motors damages it has sustained as a result of General Motors' wrongful acts and willful infringements in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court.

146.    AutoNavigare has incurred, and will incur, attorneys' fees, costs, and expenses in

the prosecution of this action. The circumstances of this dispute may give rise to an exceptional case within the meaning of 35 U.S.C. § 285, and, in such case, AutoNavigare is entitled to recover its reasonable and necessary attorneys' fees, costs, and expenses.

## JURY DEMAND

AutoNavigare hereby requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

AutoNavigare respectfully requests that the Court find in its favor and against General Motors, and that the Court grant AutoNavigare the following relief:

(i)     Judgment that one or more claims of the Asserted Patents have been infringed, either literally and/or under the doctrine of equivalents, by General Motors;

(ii)    Judgment that one or more claims of the Asserted Patents have been willfully infringed, either literally and/or under the doctrine of equivalents, by General Motors;

(iii)   Judgment that General Motors account for and pay to AutoNavigare all damages and costs incurred by AutoNavigare because of General Motors' infringements and other conduct complained of herein, including accounting for any sales or damages not presented at trial;

(iv)    Judgment that General Motors account for and pay to AutoNavigare a reasonable, ongoing, post-judgment royalty because of General Motors' infringements, including continuing infringing activities, and other conduct complained of herein;

(v)     Judgment that AutoNavigare be granted pre-judgment and post-judgment interest on the damages caused by General Motors' infringements and other conduct

complained of herein;

(vi)    Judgment that this case is exceptional under the provisions of 35 U.S.C. § 285 and

award enhanced damages; and

(vii)    Such other and further relief as the Court deems just and equitable.

Dated: December 10, 2025                    Respectfully submitted,

*/s/ Edward R. Nelson III*
Edward R. Nelson III
State Bar No. 00797142
NELSON BUMGARDNER CONROY PC
3131 West 7th Street, Suite 300
Fort Worth, Texas 76107
Tel: (817) 377-9111
ed@nelbum.com

Ryan P. Griffin
State Bar No. 24053687
Nathan L. Levenson
State Bar No. 24097992
Brandon G. Moore
Texas Bar No. 24082372
NELSON BUMGARDNER CONROY PC
2727 N. Harwood St., Suite 250
Dallas, TX 75201
Tel: (817) 377-9111
ryan@nelbum.com
nathan@nelbum.com
brandon@nelbum.com

Timothy E. Grochocinski
Illinois Bar No. 6295055
C. Austin Ginnings
New York Bar No. 4986691
NELSON BUMGARDNER CONROY PC
745 McClintock Road, Suite 340
Burr Ridge, IL 60527
708.675.1975
tim@nelbum.com
austin@nelbum.com

**Attorneys for Plaintiff**
**AutoNavigare LLC**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on December 10, 2025, the foregoing was filed with the Court via its CM/ECF system, which will send notice to counsel for Defendant.

*/s/ Edward R. Nelson III*